UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY D. JONES,<br><br>                           Plaintiff,<br><br>-against-<br><br>ANDREW M. CUOMO, in his official capacity as the Governor of the State of New York, and, HOWARD ZUCKER, M.D., in his official capacity as the Commissioner of the Department of Health of New York.<br><br>                           Defendant. | Index No. 20-cv-04898<br><br><br>**AMENDED COMPLAINT**<br><br><br>PLAINTIFF DEMANDS A TRIAL BY JURY |

Pursuant to Federal Rule of Civil Procedure 15, Plaintiff, Jeffrey D. Jones ("Plaintiff"), as for his *Amended Complaint* against Defendants, Andrew M. Cuomo, in his official capacity as the Governor of the State of New York ("Defendant" or "Governor Cuomo"), and Howard Zucker, M.D., in his official capacity as the Commissioner of the Department of Health of New York ("Defendant" or "Commissioner Zucker"), hereby alleges as follows:

## PARTIES

1. Mr. Jeffrey D. Jones ("**Plaintiff**" or "**Jones**") is an American-born United States citizen.

2. Plaintiff resides with his partner in Tulsa, Oklahoma.

3. Plaintiff is a duly licensed member of the New York State Bar, and has always been in good standing since his admission (First Judicial Department) in or around April 2010.

4. Acting as an attorney, Plaintiff regularly represents wrongfully terminated and harassed employees nationwide, and specifically in New York State. Indeed, a majority of the

1

firm's work includes representation of employees who are working in Manhattan and are wronged by their employer.

5. Such representation includes, but is not limited to: private settlement negotiations, formal court proceedings in federal court, and attendant depositions and court-mandated mediations.

6. Defendant Andrew M. Cuomo ("**Defendant**" or "**Governor Cuomo**") is and was the Governor of the State of New York, and is and was acting under color of State law and in his official capacity, at all times relevant to the allegations herein.

7. Defendant Howard Zucker, M.D., J.D., ("**Defendant**" or "**Commissioner Zucker**") (collectively with Governor Cuomo, "**Defendants**") is and was the Commissioner of the State of New York, and is and was acting under color of State law and in his official capacity, at all times relevant to the allegations herein.

8. Upon information and belief, Defendants' principal place of business is located at the State Capitol Building, Albany, New York 12224.

## JURISDICTION AND VENUE

9. Jurisdiction is founded upon 28 U.S.C. § 1331.

10. This Court has jurisdiction because the Court has subject matter jurisdiction over the claims asserted by Plaintiff Jones as this action involves claims founded upon Article I of the United States Constitution, and the Fifth, Ninth, Tenth, and Fourteenth Amendments to the United States Constitution.

11. In addition, this Court has jurisdiction as this action seeks to prevent Governor Cuomo (a state official) from interfering, frustrating, and otherwise violating federal rights secured by the United States Constitution.

12. Jurisdiction is also founded upon 28 U.S.C. § 1343(a)(3) and (4) because Plaintiff seeks to redress deprivations under color of state law, statute, Executive Order, ordinance,

regulation, custom or usage of rights, privileges, and immunities secured by the federal United States Constitution.

13. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2), in that a substantial part—or most—of the events or omissions giving rise to the claims in this *Amended Complaint* occurred or will occur in Manhattan.

14. There is a present and real, actual controversy between the parties.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

15. In November 1983, Plaintiff was born a free man and the federal Constitution enshrined in him the right to travel among the various states of his nation—The United States of America.

16. The right to freedom of movement between the nation's constituent states is no trifling matter and is at the core of the Constitution's fundamental rights.

17. The world generally, and the United States specifically, have been grappling with a catastrophic global-pandemic since in or around December 2019 when the outbreak was first noticed and alarms went off in Wuhan, China.

18. In or around January 2020, the World Health Organization officially titled the novel coronavirus "SARS-Cov-2," which stands for Sudden Acute Respiratory Syndrome Coronavirus 2.

19. SARS-Cov-2 can cause the condition officially titled "COVID-19." The relationship of SARS-Cov-2 to COVID-19 can be analogized to Human Immunodeficiency Virus ("HIV") and Acquired Immune Deficiency Syndrome ("AIDS") in that it is the virus that may then cause the subsequent condition.

20. SARS-Cov-2 also has many other unofficial names—many of which trace their origin to ignorance, xenophobia, or a regrettable us-versus-them impulse—and this pleading shall refer to the virus as SARS-Cov-2.

21. Half a year later since the emergence of SARS-Cov-2, Americans have taken a crash-course in epidemiology, virology, physics, chemistry, and biology in attempting to contain the virus, and when containment failed to mitigate the losses we—as a community—will suffer.

22. Indeed, whether SARS-Cov-2 has increased a store's revenue or shuttered its doors, there is not a single American or business that has escaped untouched by the global pandemic. Every citizen will have a story to tell about their own and their family's physical and financial survival during this (hopefully) once-in-a-lifetime global pandemic, and the actions they took or did not take during this time.

23. Broadway is shuttered, airlines are on life support, tens of millions have been laid off or terminated for financial reasons, hotels are running at less than 10% capacity, social distancing instructions are ubiquitous, sports and concerts have been called-off, and grocery store employees have turned into real-life heroes.

24. Whatever one thinks of the federal government's response (or lack thereof) to SARS-Cov-2, the facts remain the same: as of June 2020 the United States has suffered more than one-hundred and twenty-eight thousand (128,000) deaths, thousands of "recovered" people have temporary and potentially permanent lung damage (damage so severe that a walk up a single flight of stairs to a former marathon runner is exhausting), blood clotting dynamics caused by the body's response to the virus are causing limb amputations, strokes, and blindness, and confirmed (and unconfirmed) cases are on the rise.

25. Dr. Fauci is a doctor on the White House's SARS-Cov-2 task force, and he stated in June 2020 that he is "cautiously optimistic" that a vaccine "might" be available by January 2021. A day later Dr. Fauci in an on-television interview detailed that such a vaccine would need to have a 70 to 75% efficacy rate to achieve "herd immunity." In other words, there is no quick fix, and *if* a vaccine is sufficiently effective, its widespread administration in a timely manner is doubtful at best given that the United States of American cannot make enough N-95 masks and paper gowns to cloth its first-responders, doctors, and nurses.

26. Indeed, given the current rate of simply testing for SARS-Cov-2—either the active virus or the resultant antibodies—the United States would need years to test each soul in the United States just once. The Centers for Disease Control based in Atlanta, Georgia as of June 29, 2020 reported almost thirty-four million (33,601,847) "tests reported."

27. In other words, it took half a year to simply test one-tenth ($1/10^{th}$) of the United States population *once*. At that rate, it would take five (5) years to simply test each United States soul *once*. Without belaboring the point, there is no quick fix in sight—even in a best case scenario.

28. All of this virus talk is simply to make one point: the government possesses a compelling state interest to protect the public health and save lives during this (hopefully) once-in-a-lifetime, horrible event. Let us remember the path to hell is often paved with good intentions.

29. On June 24, 2020, Governor Cuomo signed Executive Order 205 ("**EO205**"), which went into effect on June 25, 2020 and shall remain in effect, "until rescinded by the Commissioner [of the Department of Health]."

30. EO205 stated, in relevant part: "[a]ll travelers entering New York from a state with a positive test rate higher than 10 per 100,000 residents, or higher than a 10% test positivity rate, over a seven-day rolling average, will be required to quarantine for a period of 14 days consistent with Department of Health regulations for quarantine."

31. At the time of its promulgation, approximately ten (10) states within the nation fell within its purview.

32. Perhaps showing the absurdity of this scheme, within hours Commissioner Zucker determined, in substantial form: oops, we got some bad data from Washington state, Washington state is no longer on the 'dirty' list.

33. EO205 further states, in relevant part: "[a]ny violation of a quarantine or isolation order…may be enforced…and non-compliance may additionally be deemed a violation…subject to a civil penalty of up to $10,000.00."

34. EO205 does not define the phrase "entering New York from a state…" and, *inter alia*, is critically void for vagueness.

35. For example, as of this filing Oklahoma is a 'clean' state, and Texas is a 'dirty' state. If a resident of Oklahoma flies through DFW airport in Texas, is that person entering from Oklahoma, from Texas, or from both states?

36. EO205 does not specify if airport terminals are permissible areas to prevent a traveler from Oklahoma, connecting at DFW in Texas for a LaGuardia-bound flight, to render them as untainted by 'dirty' Texas.

37. EO205 does not specify if leaving the terminal for a cigarette break, or going two miles from the airport to pick-up lunch during a long-layover, are permissible or impermissible actions that would render a person as "entering" New York from a 'dirty' State.

38. EO205 does not specify if traveling for hours in an enclosed cabin next to travelers from 'dirty' states renders everyone onboard as "entering" New York from a 'dirty' State. Does one 'bad' apple ruin the bunch?

39. EO205 does not specify if traveling into New York by car is permissible only via roads not located in 'dirty' states, or if a person is permitted to drive thru a 'dirty' state, without being ensnared by the executive order. Must a driver keep their windows rolled-up, and their A/C on recirculation, so as to avoid becoming contaminated by the 'dirty' State's air? If windows can be rolled-down, what about touching gas pumps, eating inside a roadside diner, sleeping overnight in a motel, or stopping off to visit friends for a long-weekend in the 'dirty' state and on the way to New York?

40. EO205 does not define at what point a person is "entering" from a 'clean' state, and at what point a person is now "entering" from a 'dirty' state.

41. The days of the Pony Express and covered wagons are over. Even a direct flight from LAX to LGA is going to find a person "entering" (as best as can be surmised from this overly vague EO205) from California sitting in the same air as people from 'dirty' states (domestic American states and international nation-states).

42. EO205 is also fatally flawed for another independently sufficient reason, namely: EO205 is not the least restrictive means to accomplish the government's compelling interest in maintaining and protecting public health.

43. Impingement on fundamental rights, especially under emergency powers not subject to ordinary debate and comment, requires that a government act in the least restrictive manner.  And federal jurisprudence, though mixed, has shown courts to be keenly aware during such circumstances and dynamics.

44. EO205 is not the least restrictive means to accomplish New York's compelling interest because it is, *inter alia*, fatally over and under broad.

45. For example, EO205 is overbroad because it would prohibit a conscientious model citizen from a 'dirty' state ("**Dirty State Jane**"), who only goes out for groceries and medicine, always wears a face mask, and bleaches her entire house everyday.  Conversely, it would permit a citizen from a 'clean' state ("**Clean State Jane**") who flouts distancing orders, regularly congregates in crowded bars and nightclubs, and actively tries to contract SARS-COV-2 in an attempt to "get immunity" or "hurry up and get sick before all the ICU beds fill up."

46. No rational person would conclude that Clean State Jane's behaviors are safer than Dirty State Jane's behaviors.  But that is precisely the result EO205 would not only permit, but *mandate*.

47. Less restrictive means exist to accomplish New York's compelling state interest in protecting public health, including, but not limited to: making person's coming into the state wear a face mask, making passengers (air, car, rail, *etc*.) fill-out a survey, under penalty of perjury, about their behaviors and past exposures, and/or making all persons sign a pledge, under penalty of perjury, that he or she will socially distance and only go out for essential business.

48. Defendants chose to implement none of these lesser restrictive and more efficacious methods.  Instead, EO205 ham-fistedly denies United States citizens freedom of movement across state borders based on a 'clean' and 'dirty' list.

49. An elephant in the room must be addressed: if EO205 is so important, then why is the order essentially silent as to—precisely—how it will be communicated and enforced. Indeed, EO205 itself reveals its toothless communication and enforcement mechanism when it states, in relevant part: "The commissioner [*sic*] of the Department of Health [is] to issue a travel advisory to be communicated widely at all major points of entry into New York, including on **highway message boards** and in all New York airports…" (emphasis added). Seriously?

50. This point is worth making regarding communication: let us assume you are driving a vehicle on a highway into New York at sixty (60) miles per hour. How big is your message board that you can alert drivers—who will have about two seconds, and then they have to glance at the road, and then another two seconds—to read a board that: (1) informs them of the mandatory 14 day quarantine, (2) informs them of the (ever changing) list of 'dirty' states, (3) defines (as EOC205 does not currently) whether or not their passing presence in a 'dirty' states implicates them or not, (4) and puts them on notice of the forcible measures and/or $10,000 dollar penalty for violation of EO205.

51. As a threshold matter, reading a message board is not required, especially if doing so would endanger the driver and/or others' immediate physical safety while on the motorway.

52. Let us assume a driver is operating a motor vehicle at sixty (60) miles per hour and has roughly four (4) seconds to take her eyes away from the road to read a (very) large or (likely) smaller message board that would then require the script to 'flip'—and please try to read the following message, in as short a form as possible, in four seconds or less: "From Alabama, Arkansas, Arizona, Florida, North Carolina, South Carolina, Texas, or Utah? Mandatory quarantine-14 days. Violators compelled to quarantine and/or 10K fine." The undersigned wrote the sentence, knows what it intends to communicate, but took 5.43 seconds to simply read the words—not aloud, but in his head.

53. In short, Governor Cuomo is running roughshod over core Constitutional liberties and his purported communication of EO205 is for people to, voluntarily, read a highway "message board." This method of purported communication of EO205's ever-changing list of 'dirty' states

cannot possibly pass strict scrutiny as it does not even pass the law school 'laugh-test'. Having a compelling state interest and merely good intentions is insufficient to infringe on Constitutional rights.

54. This lawsuit stipulates Governor Cuomo has a compelling state interest, and freely grants Governor Cuomo's good intentions. But interposing a scheme that impinges on Constitutional rights must be the 'least restrictive' means of accomplishing the compelling interest. The highway "message board" means cannot even be termed a means in a legal sense. A highway message board, on its face, cannot—given current space-time continuum constraints—deliver the intended message to persons "entering" from the targeted states. Let us remember we have not even tried to define—via Our Hero, the highway message board—what "entering" from those states means and does not mean. Footnotes and highway message boards do not mix.

55. EO205 is also impermissibly arbitrary and capricious because the data it uses to compile its list is inaccurate and incomplete.

56. EO205 does not set up an independent monitoring system for each state, nor does it rely on a federal data collection process.

57. Upon information and belief, EO205 takes data from the states themselves and uses that data to compile its 'dirty' and 'clean' list. The result of this process is that a state with poor testing protocols (but a raging COVID19 outbreak) is rewarded, but a state attempting to know the enemy it is facing is penalized. As President Trump has famously quipped numerous times publicly: if you don't test, you don't have any cases.

58. Plaintiff went to Arkansas recently, and EO205 (insofar as it can be surmised from its overly vague language) will prevent Plaintiff from entering New York without the undue and excessive burden of a fourteen (14) day quarantine. And all of this because Plaintiff responsibly, with a face mask, hand sanitizer, and distance procedures in place, deigned to enter a 'dirty' state for a few hours.

59. Plaintiff has, and will, suffer business losses and contract interference because of EO205 because he cannot properly service his clients.

60.     Plaintiff has multiple New York-based clients and federal filings (court hearings, mediations, depositions, *etc*.) in New York that he cannot service without the undue and excessive burden of quarantining fourteen (14) days every time he enters New York.

61.     Defendants have not "closed the valve" to all entrants into the State of New York as Cuomo once quipped about "shutting down" the State.  Instead, New York has taken the unprecedented stance of picking and choosing winners and losers (*i.e.*, discriminating), and the State masquerades its feeble attempt at public safety behind a 'dirty' and 'clean' list derived from numbers that are incomplete and inaccurate and not the least restrictive means to accomplish the goal.  What is more, in picking winners and losers, New York has left every person wondering whether or not he or she falls within the snares of EO205.

62.     EO205 attempts to tackle a problem as complex as chess, and instead interposes a scheme better-suited to settling disputes in a checkers match.   Hiding behind numbers and lists of 'clean' and 'dirty' states does not a scheme passing strict-scrutiny make.

## FIRST CLAIM

Violation of Freedom of Travel Among the States

63.     Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

64.     This claim is against both named-Defendants in the caption, above.

65.     All conditions precedent to this lawsuit have been fulfilled.

66.     At all relevant times Defendants were acting under the color of state law.

67.     Upon information and belief, Defendants' actions were done intentionally or with reckless indifference to Plaintiff's Constitutionally protected rights.

68.     As a direct and proximate result of the intentional and/or reckless Defendants' actions, Plaintiff suffered loss of employment, lost wages, monetary damages, emotional distress, contract interference, the incursion of attorneys' fees, costs, and other damages.

## SECOND CLAIM
Violation of the Equal Protection Clause

69. All preceding paragraphs are incorporated by reference as if fully stated herein.

70. This claim is against both named-Defendants in the caption, above.

## THIRD CLAIM
Violation of the Privileges and Immunities Clause

71. All preceding paragraphs are incorporated by reference as if fully stated herein.

72. This claim is against both named-Defendants in the caption, above.

## FOURTH CLAIM
Violation of the Contracts Clause

73. All preceding paragraphs are incorporated by reference as if fully stated herein.

74. This claim is against both named-Defendants in the caption, above.

75. Plaintiff Jones entered bilateral contracts with Manhattan-based clients before EO205 was signed and went into effect.

76. Plaintiff Jones entered a bilateral contract with a client after EO205 was signed and went into effect.

77. Defendants—via EO205—have impermissibly interfered with Plaintiff Jones' contracts with his clients in that, *inter alia*, depositions cannot be taken, court appearances cannot be made, client consultations may not be conducted, and

mediation sessions may not be attended—without the unreasonable burden interposed by EO205 of a 14-day quarantine.

78. Defendants have awarded reckless businessmen from 'clean' states an unfair marketplace advantage by not imposing a mandatory fourteen (14) day quarantine on individuals who would willfully flout mask wearing protocols, social distancing protocols, and actively attempt to contract and/or spread SARS-Cov-2, while simultaneously penalizing businessmen "entering" (still undefined and impermissibly vague) from 'dirty' states who follow mask wearing protocols, social distancing protocols, and actively attempt to stop exposures or minimize the ingested dosage should an exposure occur.

79. In short, Defendants have impermissibly interfered with contracts by picking 'winners' and 'losers' not with particularized and meaningful considerations, but rather with ham-fisted, broad strokes that would have businesses rise and fall vis-à-vis Commissioner Zucker's 'dirty' and 'clean' state list.  To excise SARS-Cov-2, the undersigned respectfully requests a science-based surgeon calmly holding a scalpel rather than a good-intentioned but frightened madman wielding an axe.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jeffrey D. Jones, *respectfully* requests judgment against the above-named Defendants as follows:

A. An award of damages against Defendant, in an amount greater than $75,000.00 and to be determined at jury trial, pursuant to 28 U.S.C. § 1391(a)(4);

B. An injunction forbidding enforcement of Executive Order 205, pursuant to 28 U.S.C. § 1651(a);

  C. Declaratory relief or a declaratory judgment, pursuant to 28 U.S.C. § 2201, and 2202;

  D. All actual and equitable relief as this Court deems just, pursuant to 42 U.S.C. § 1983;

  E. An award of costs and attorney's fees, pursuant to 42 U.S.C. § 1988;

  F. Prejudgment interest on all amounts due; and,

  G. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby *respectfully* demands a trial by jury on all issues that can be considered, determined, and/or resolved by a jury.

**Dated:** New York, New York
   June 30, 2020

               **Respectfully submitted,**

               By: /s/ Jeffrey D. Jones

                 Jeffrey D. Jones, *Esq*.
                 SDNY #JJ1983; NY Bar #4843363
                 **THE JONES LAW FIRM**
                 523 East Pine Place
                 Tulsa, OK 74106-4301
                 (574) 876-4715
                 jj@jeffreyjoneslawfirm.com