UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JEFFREY D. JONES, | |
| Plaintiff, | |
| -v.- | 20 Civ. 4898 (KPF) |
| ANDREW M. CUOMO, in his official capacity as the Governor of the State of New York; and HOWARD ZUCKER, M.D., in his official capacity as the Commissioner of the Department of Health of New York, | **OPINION AND ORDER** |
| Defendants. | |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Jeffrey Jones, an attorney proceeding *pro se*, filed this action against Governor Andrew Cuomo and New York State Department of Health ("DOH") Commissioner Howard Zucker, M.D., in their official capacities (collectively, "Defendants"). In it, Plaintiff raised various constitutional challenges to Governor Cuomo's Executive Order No. 205: Quarantine Restrictions on Travelers Arriving in New York (hereinafter, the "Executive Order"), which at the time Plaintiff filed his Amended Complaint imposed a self-quarantine requirement on certain persons entering New York State. In particular, Plaintiff argued that the Executive Order violated several of his rights under the U.S. Constitution, including: (i) the right to interstate travel; (ii) the Privileges and Immunities Clause of Article IV; (iii) the Fourteenth Amendment's Equal Protection Clause; and (iv) the Contracts Clause of Article I. In addition, Plaintiff argued that the Executive Order was unconstitutionally vague. Plaintiff sought money damages, as well as injunctive and declaratory relief.

Defendants have moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, Defendants' motion is granted.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties and Executive Order No. 205

Over the course of 2020, New York State enacted a series of evolving emergency actions in response to the COVID-19 pandemic.  (*See* FAC ¶ 23). One such action was Executive Order No. 205, issued by Governor Cuomo on June 24, 2020.  (*See id.* at ¶¶ 29-30).  The Order directed Health Commissioner Zucker to issue a travel advisory stating that:

> All travelers entering New York from a state with a positive test rate higher than 10 per 100,000 residents, or higher than a 10% test positivity rate, over a seven-day rolling average, will be required to

---

[1]    The facts in this Opinion are drawn in part from Plaintiff's Amended Complaint (the "FAC" (Dkt. #3)), the well-pleaded allegations of which are taken as true for the purposes of this motion.  When considering a motion made pursuant to Rule 12(b)(6), the Court may take judicial notice of "documents retrieved from official government websites," *see Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015), or other "relevant matters of public record," *see Giraldo* v. *Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); *see also* Fed. R. Evid. 201(b) (permitting judicial notice of facts "not subject to reasonable dispute").  For this reason, the Court draws additional facts from certain exhibits appended to the declaration of Bryon Backenson submitted in support of Defendants' motion to dismiss ("Backenson Decl., Ex.[]" (Dkt. #18)), which exhibits contain documents retrieved from official government websites.  These documents include: the July 9, 2020 World Health Organization ("WHO") Transmission of SARS-CoV-2 Scientific Brief ("WHO Scientific Brief" (Backenson Decl., Ex. F)), and the New York State Department of Health's ("DOH") June 24, 2020 Interim Guidance for Quarantine Restrictions on Travelers Arriving in New York State Following Out of State Travel ("DOH Interim Guidance" (*id.*, Ex. O)).  The transcript of the July 2, 2020 proceedings in *Corbett* v. *Cuomo*, No. 20 Civ. 4864 (LGS) (S.D.N.Y.), is referred to as "*Corbett* Tr." (Dkt. #19-1).  Moreover, where relevant, the Court acknowledges New York State guidance enacted subsequent to Plaintiff's filing of his Amended Complaint.

For ease of reference, the Court refers to Defendants' brief in support of their motion to dismiss as "Def. Br." (Dkt. #17); Plaintiff's opposition as "Pl. Opp." (Dkt. #20); and Defendants' reply brief as "Def. Reply" (Dkt. #21).

> quarantine for a period of 14 days consistent with
> Department of Health regulations for quarantine.

(*See* Executive Order).  Any violation of the quarantine requirement was enforceable pursuant to Article 21 of New York's Public Health Law, and non-compliance could subject the violator to a civil penalty of up to $10,000. (*Id.*).

Pursuant to the Executive Order, Health Commissioner Zucker issued "Interim Guidance for Quarantine Restrictions on Travelers Arriving in New York State Following Out of State Travel."  (*See* DOH Interim Guidance). The DOH Interim Guidance provides that states falling within the Executive Order's positivity criteria would be identified based on the "tables posted publicly by all 50 states," with "[a]nalysis of the metrics ... conducted weekly to determine if travelers from other states qualify."  (*Id.* at 2).  The "restricted" states with "significant community spread" were, in turn, "conspicuously posted" on the DOH website, with updates posted weekly. (*Id.*).  At the time the Executive Order was enacted, approximately ten states met or exceeded its positive test rate threshold.  (FAC ¶ 31).

Plaintiff is an attorney who resides in Oklahoma.  (FAC ¶ 2).  At the time Plaintiff filed his Amended Complaint, Oklahoma's positive test rate remained below the Executive Order's threshold.  (*Id.* at ¶ 4).  However, Plaintiff alleged that he had recently traveled to Arkansas, and that travelers from that state were subject to the Executive Order's quarantine requirement at that time.  (*Id.* at ¶ 58).

Plaintiff has been admitted to the practice of law in New York State since April 2010.  (FAC ¶ 3).  In this capacity, Plaintiff has represented

clients in employment disputes in New York State.  (*Id.* at ¶¶ 4-5).  At the time Plaintiff filed his Amended Complaint, he was representing multiple New York-based clients in cases where court hearings, mediations, and depositions had been scheduled to take place in New York.  (*Id.* at ¶ 60). Plaintiff alleged that because he had recently traveled to Arkansas, were he to travel to New York, he would be required to self-quarantine for fourteen days under the terms of the Executive Order.  (*Id.* at ¶ 58).  He further alleged that were he subjected to this requirement each time he visited New York for business, he would be unable to "properly service" his New York-based clients.  (*Id.* at ¶¶ 59-60).

### 2.    Subsequent Developments in New York State Quarantine Requirements

The Executive Order has been superseded by subsequent executive orders and travel guidelines since the filing of Plaintiff's Amended Complaint.  *See, e.g.*, Executive Order No. 205.1 (Sept. 28, 2020); Executive Order No. 205.2 (Oct. 31, 2020); Executive Order No. 205.3 (Dec. 30, 2020). Most recently for these purposes, on April 10, 2021, the DOH issued its "Updated Interim Guidance for Travelers Arriving in New York State (NYS)" (the "Updated Interim Guidance").  This guidance applies to all travelers, including New Yorkers and those visiting from out-of-state or another country.  Pursuant to this guidance, New York State's current COVID-19 travel advisory provides:

> Asymptomatic travelers entering New York from another country, U.S. state, or territory are *no longer required* to test or quarantine as of April 10, 2021.  Quarantine, consistent with the CDC recommendations, is *still recommended* for all travelers who are not fully vaccinated or have not recovered from

> laboratory confirmed COVID-19 during the previous 3
> months.  Symptomatic travelers must immediately self-
> isolate and contact the local health department or their
> healthcare providers to determine if they should seek
> COVID-19 testing.

New York State COVID-19 Travel Advisory,

https://coronavirus.health.ny.gov/covid-19-travel-advisory (last visited

May 30, 2021) (emphasis in original).

## B.    Procedural Background

The day after the Executive Order was issued, on June 25, 2020,

Plaintiff initiated this action with the filing of his Complaint.  (Dkt. #1).  Five

days later, on June 30, 2020, Plaintiff filed his Amended Complaint, which

is the operative pleading in this action.  (Dkt. #2).

On September 14, 2020, Defendants filed a letter seeking a pre-

motion conference regarding their anticipated motion to dismiss (Dkt. #13),

and on September 17, 2020, Plaintiff opposed their application (Dkt. #14).

The following day, the Court declined to hold a pre-motion conference and

set a briefing schedule for Defendants' anticipated motion.  (Dkt. #15).

Pursuant to that schedule, Defendants filed their motion to dismiss and

supporting papers on October 16, 2020 (Dkt. #16-19); Plaintiff filed his

opposition brief on November 13, 2020 (Dkt. #20); and briefing concluded

with the submission of Defendants' reply brief and supporting papers on

November 30, 2020 (Dkt. #21-22).

## DISCUSSION

## A.    Applicable Law

To survive a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations "to

state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  A complaint that contains only "naked assertions" or "a formulaic recitation of the elements of a cause of action" does not suffice.  *Twombly*, 550 U.S. at 555.  The Court must accept as true all well-pleaded factual allegations in the complaint.  *See Iqbal*, 556 U.S. at 678.

Plaintiff is a licensed attorney who is proceeding *pro se*.  Although the pleadings of *pro se* parties are typically "held to less stringent standards than formal pleadings drafted by lawyers," *Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted), the law is clear that "*pro se* attorneys ... 'cannot claim [this] special consideration,'" *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (quoting *Harbulak* v. *County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)); *see also Tracy* v. *Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) (collecting cases supporting the proposition that "a lawyer representing himself ordinarily receives no [special] solicitude"); *Abraham* v. *Leigh*, 471 F. Supp. 3d 540, 553 (S.D.N.Y. 2020), *reconsideration denied*, No. 17 Civ. 5429 (KPF), 2020 WL 5095655 (S.D.N.Y. Aug. 28, 2020).

## B.   Analysis

### 1.   The Case Is Not Moot

As observed above, the Executive Order has since been superseded by less restrictive executive orders and guidance issued in response to the

6

rollout of COVID-19 vaccines and the concomitant decline in positive test results.  At the time the instant motion was briefed, Defendants did not move to dismiss on mootness grounds, though they did indicate that the Court should consider the Amended Complaint in light of amendments to the Executive Order in effect at the time of briefing.  (See Def. Reply Mem. 1-2 (discussing Executive Order 205.2)).  However, when a case becomes moot, a district court no longer has subject matter jurisdiction, *see Fox* v. *Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994), and courts may consider whether they have subject matter jurisdiction *sua sponte* at any stage of the litigation, *see Fed. Dep. Ins. Corp.* v. *Four Star Holding Co.*, 178 F.3d 97, 100 n.2 (2d Cir. 1999).  For this reason, the Court begins by addressing the threshold issue of whether it continues to retain subject matter jurisdiction, *i.e.*, whether this case has been mooted by subsequent developments in New York State's quarantine requirements.

Under the "case or controversy" requirement of Article III of the Constitution, "at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural."  *Russman* v. *Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet,* 260 F.3d 114, 118 (2d Cir. 2001).  A case is moot, and therefore no longer a case or controversy for the purposes of Article III, "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Already, LLC* v. *Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted).

There is, however, a well-recognized exception to the mootness doctrine.  A defendant's "voluntary cessation of challenged conduct does not ordinarily render a case moot."  *Knox* v. *Serv. Emp. Int'l Union, Local 1000,*

567 U.S. 298, 307 (2012).  However, a voluntary change of conduct moots a case where a defendant can demonstrate that "[i] there is no reasonable expectation that the alleged violation will recur and [ii] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Mhany Mgmt., Inc.* v. *Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016).  Against this background, the Court will consider whether Plaintiff's Amended Complaint has been rendered moot by superseding guidance, or whether the voluntary cessation exception applies.

As discussed above, the Executive Order was subsequently superseded by further executive orders, and most recently, by the Updated Interim Guidance.  At this time, New York State no longer requires that asymptomatic travelers quarantine, regardless of the state from whence they came.  Plaintiff's Amended Complaint thus challenges the enforcement of a quarantine requirement that is no longer in effect.

That said, in recent months, the Supreme Court has provided guidance for assessing mootness in challenges to COVID-19 restrictions.  In *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 141 S. Ct. 63 (2020) (per curiam), wherein plaintiffs moved for emergency injunctive relief against Governor Cuomo's restrictions on in-person worship services, the Supreme Court determined that the Governor's modification of the restrictions at issue had not rendered the case moot.  *Id.* at 68.  The Court explained that "injunctive relief is still called for because the applicants remain under a constant threat … [of being] bar[red] … from attending services before judicial relief can be obtained."  *Id.*  And more recently, in *Tandon* v. *Newsom,* 141 S. Ct. 1294 (2021), the Supreme Court held that "even if the

government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case." *Id.* at 1297.

A sister court in this District derived "two mootness principles" from these decisions:

> [i] a lawsuit brought against COVID restrictions is not simply moot because the restrictions at issue have been rescinded; and [ii] if the COVID restrictions (at issue) have been rescinded in the course of litigation, the relevant inquiry is whether the plaintiff remains under a 'constant threat' of those restrictions being reintroduced in the future.

*Hopkins Hawley LLC* v. *Cuomo*, No. 20 Civ. 10932 (PAC), 2021 WL 1894277, at *4 (S.D.N.Y. May 11, 2021).  The court applied these principles to determine whether a challenge to certain restrictions on indoor and outdoor restaurant dining had been rendered moot, and concluded that despite the revocation of those restrictions, plaintiffs remained "under the 'constant threat' of confronting the [restrictions] again" and thus the case was not moot.  *Id.*

Since the *Roman Catholic Diocese* and *Tandon* decisions, a number of courts have similarly declined to dismiss COVID-19 restriction lawsuits on mootness grounds.  *See Hopkins Hawley LLC*, 2021 WL 1894277, at *4 (collecting cases); *see also Amato* v. *Elicker*, No. 20 Civ. 464 (MPS), 2021 WL 1430918, at *4 (D. Conn. Apr. 15, 2021) (determining that plaintiffs' challenges to various COVID-19 restrictions were not moot under voluntary cessation exception where the Governor of Connecticut "[could not] say with certainty that it will never be necessary to re-impose restrictions in the future"); *but see Herndon* v. *Little*, No. 20 Civ. 205 (DCN), 2021 WL 66657, at *5 (D. Idaho Jan. 7, 2021) (finding "under the circumstances and given the

9

details of Idaho's Stay Healthy Orders, it appears reasonably likely that the restrictions will not be reimposed at a future time").

In recent months, New York State, as well as much of the United States, has made progress towards the resumption of "normal" life, largely because of improved vaccine availability and the overall decline in COVID-19 cases and hospitalizations.  However, it remains the case that "the only certainty about the future course of this pandemic is uncertainty."  *Hopkins Hawley LLC*, 2021 WL 1894277, at *4.  Moreover, as the district court observed in *Hopkins Hawley*, Governor Cuomo retains the ability to extend or modify currently existing COVID-19 restrictions so long as he: (i) gives five days' notice to the state legislature and affected municipalities; and (ii) provides an opportunity for the political branches to offer feedback on his proposed directives.  *Id.* at *4 n.3 (discussing Act of March 7, 2021, ch. 71, 2021 N.Y. Laws 5357).  Given the unpredictability of the ongoing pandemic and the ensuing public health response to it, as signified by Governor Cuomo's retention of the authority to reintroduce COVID-19 restrictions, the Court finds that Plaintiff remains under a "constant threat" of re-confronting the quarantine requirement.  Accordingly, this case is not moot, and the Court will consider the merits of Defendants' motion to dismiss under Rule 12(b)(6).

### 2.    Plaintiff's Claims Fail to Withstand Scrutiny

In brief, Plaintiff alleges that the Executive Order creates a "dirty list" of states that meet the Order's threshold for COVID-19 test positivity rates. (FAC ¶¶ 33, 53).  Residents of said "dirty" states are treated differently than residents of "clean" states with respect to their travel to New York State, as

only the former group is required to quarantine for fourteen days upon arrival.  (*See id.* at ¶¶ 45-46).  Plaintiff further submits that the Executive Order is not the "least restrictive means to accomplish the government's compelling interest in maintaining and protecting public health."  (*Id.* at ¶ 42).  Accordingly, Plaintiff asserts violations of: (i) the right to interstate travel; (ii) the Privileges and Immunities Clause of Article IV; (iii) the Fourteenth Amendment's Equal Protection Clause; and (iv) the Contracts Clause of Article I.  (*See id.* at ¶¶ 63-79).  Plaintiff also submits that the Executive Order is unconstitutionally vague.  (*Id.* at ¶ 34).[2]

As relevant here, Defendants argue that these claims should be dismissed under the standard for assessing emergency health measures set forth in *Jacobson* v. *Massachusetts*, 197 U.S. 11 (1905).  (Def. Br. 5-7).  In the alternative, they submit that Plaintiff's claims suffer from various pleading deficiencies (*id.* at 8-11), and that in any event, the Executive Order would withstand even strict scrutiny review (*id.* at 11-12).  The Court agrees with Defendants that the Executive Order passes muster under either the *Jacobson* standard or the traditional mode of constitutional analysis.

---

[2]     At the outset, the Court dismisses Plaintiff's Contract Clause and vagueness claims, as well as any claims for damages.  In Plaintiff's opposition brief, he expresses his intent to withdraw his Contracts Clause claim.  (Pl. Opp. 14).  Further, Plaintiff's briefing fails to respond to Defendants' arguments in favor of the dismissal of his vagueness and money damages claims, and the Court will thus consider those claims conceded.  *See AT & T Corp.* v. *Syniverse Techs., Inc.*, No. 12 Civ. 1812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (finding that plaintiff's "silence concedes the point" where it failed to discuss opponent's argument in its opposition brief); *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (same); *see also Jennings* v. *Hunt Cos.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) ("A district court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (collecting cases)).  Although Plaintiff is *pro se*, for reasons discussed *supra*, the Court need not grant him the special solicitude typically afforded *pro se* litigants.  *See* Discussion Sec. A.

### a.   The *Jacobson* Standard of Review

The Court will first address the applicable standard of review.
Defendants would have the Court apply the deferential framework set forth
in *Jacobson*, pursuant to which states and local authorities are granted
substantial deference in enacting measures "to prevent the spread of
contagious diseases" during public health crises.  197 U.S. at 35.  Under
*Jacobson*, a state or local law "enacted to protect the public health" will
survive judicial scrutiny unless it bears "no real or substantial relation to
[the public health], or is, beyond all question, a plain, palpable invasion of
rights secured by the fundamental law[.]"  *Id.* at 31.  While *Jacobson*
"predated the modern constitutional jurisprudence of tiers of scrutiny,"
*Agudath Israel of Am.* v. *Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020), it has
been likened to rational basis review, *see Roman Catholic Diocese*, 141 S. Ct.
at 70 (Gorsuch, J., concurring).

In his opposition, Plaintiff contends that the Court's holding in
*Jacobson* was confined to the Massachusetts mandatory vaccination statute
challenged in the case.  (*See* Pl. Opp. 6-10).  Plaintiff argues that the Court
should instead apply strict scrutiny because the Executive Order burdens a
fundamental right — the right to travel.  (*Id.* at 10-11).

In the early days and months of the COVID-19 pandemic, a number of
courts both within and outside this Circuit applied the *Jacobson* framework
in considering challenges to state and local COVID-19 restrictions.  *See Our
Wicked Lady LLC* v. *Cuomo*, No. 21 Civ. 165 (DLC), 2021 WL 915033, at *3
(S.D.N.Y. Mar. 9, 2021) (collecting cases); *see also In re Rutledge*, 956 F.3d
1018, 1028 (8th Cir. 2020) (finding that a district court's "failure to apply

12

the *Jacobson* framework produced a patently erroneous result"). Indeed, in August of last year, a court in the Northern District of New York rejected a similar challenge to the Executive Order at issue here, finding that the Order was constitutional under *Jacobson*. *See Page* v. *Cuomo*, 478 F. Supp. 3d 355, 366 (N.D.N.Y. 2020) (collecting cases), *appeal filed*, No. 20-2704 (2d Cir. Aug. 13, 2020). And one month prior to the decision in *Page*, in assessing a plaintiff's application for preliminary relief from the Executive Order's quarantine requirement, a sister court in this District indicated that "the general principles of *Jacobson* … should inform any 'strict scrutiny' analysis." (*Corbett* Tr. 26:1-26:3).

Since the submission of Plaintiff's opposition brief, his position has been bolstered by a recent decision from the Supreme Court calling into question the continued applicability of *Jacobson*. As discussed above, in a per curiam opinion in *Roman Catholic Diocese*, the Supreme Court temporarily enjoined the enforcement of a New York executive order that placed restrictions on in-person religious services. 141 S. Ct. at 63. In reaching this determination, the Court undertook a traditional constitutional analysis of Plaintiffs' First Amendment free exercise claims, and found that the executive order was unable to withstand strict scrutiny. *Id.* at 66-68. Any discussion of or reference to the *Jacobson* standard is notably absent from the Court's decision. Instead, in a concurring opinion, Justice Gorsuch indicated that the "usual constitutional standards should apply during the current pandemic." *Id.* at 71 (Gorsuch, J., concurring). Referring specifically to *Jacobson*, Justice Gorsuch characterized the case as a "modest decision" that has been "mistaken … for a towering authority that

13

overshadows the Constitution[.]" *Id.* Justice Gorsuch emphasized that *Jacobson* "involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction." *Id.* at 70.[3]

On remand, the Second Circuit determined that the parties' and lower courts' reliance on *Jacobson* "as support for the notion that courts should defer to the executive in the face of the COVID-19 pandemic" "was misplaced." *Agudath Israel of Am.*, 983 F.3d at 635. The Court observed that *Jacobson* "predated" the "tiers of scrutiny," "was decided before the First Amendment was incorporated against the states, and 'did not address the free exercise of religion.'" *Id.* (quoting *Phillips* v. *City of New York*, 775 F.3d 538, 543 (2d Cir. 2015)).

In the wake of the *Roman Catholic Diocese* decision, some courts' confidence in *Jacobson* has similarly waned. *See, e.g., Amato*, 2021 WL 1430918, at *7 & n.11 (applying traditional tiers of scrutiny to COVID-19 restrictions); *Plaza Motors of Brooklyn* v. *Cuomo*, No. 20 Civ. 4851 (WFK) (SJB), 2021 WL 222121, at *4-5 (E.D.N.Y. Jan. 22, 2021) (declining to apply *Jacobson* to challenge of the same executive order at issue in *Roman Catholic Diocese*). However, other courts in this Circuit have cabined the *Roman Catholic Diocese* decision to First Amendment free exercise challenges, and have continued to apply *Jacobson* to other challenges to

---

[3]     Four months prior to *Roman Catholic Diocese*, Justice Alito also expressed the view that *Jacobson* does not provide the "last word on what the Constitution allows public officials to do during the COVID-19 pandemic." *See Calvary Chapel Dayton Valley* v. *Sisolak*, 140 S. Ct. 2603, 2608 (2020) (mem.) (Alito, J., dissenting). In a dissenting opinion, he wrote: "It is a considerable stretch to read [*Jacobson*] as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case." *Id.*

14

COVID-19 restrictions.  *See Hopkins Hawley LLC* v. *Cuomo,* No. 20 Civ. 10932 (PAC), 2021 WL 465437, at *5 (S.D.N.Y. Feb. 9, 2021) ("Although *Roman Catholic Diocese* and *Agudath Israel* raise doubts as to *Jacobson*'s continuing viability, *Jacobson* bears directly on this case and has not been explicitly overruled, which means that this Court is bound by it."); *see also Our Wicked Lady*, 2021 WL 915033, at *3; *Moxie Owl, Inc.* v. *Cuomo*, No. 21 Civ. 194 (MAD) (DJS), 2021 WL 1402297, at *2 *n.1 (N.D.N.Y. Mar. 18, 2021).  And a number of courts in other circuits have taken similar approaches.  *See, e.g.*, *Big Tyme Inv., L.L.C.* v. *Edwards*, 985 F.3d 456, 470-71 (5th Cir. 2021) (holding that *Jacobson* "govern[s] our review of emergency public health measures, regardless of the rights at stake."); *Stewart* v. *Justice*, No. 20 Civ. 611 (RCC), 2021 WL 472937, at *3 (S.D.W. Va. Feb. 9, 2021) ("[T]he Court declines to read the tea leaves of *Roman Catholic Diocese* and will follow the [*Jacobson*] rule adopted by a majority of courts."); *M. Rae, Inc.* v. *Wolf*, No. 20 Civ. 2366 (CCC), 2020 WL 7642596, at *6 (M.D. Pa. Dec. 23, 2020) ("The bottom line for our purposes is that *Jacobson* is controlling precedent until the Supreme Court or Third Circuit Court of Appeals tell us otherwise.").

More recently, a sister court in this District held that *Jacobson* remained applicable on *stare decisis* grounds, reasoning that if a Supreme Court decision "'has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.'"  *Hopkins Hawley LLC*, 2021 WL 1894277, at *5 n.4 (quoting *Rodriguez de Quijas* v. *Shearson/Am. Exp., Inc.*,

490 U.S. 477, 484 (1989)).  The Court finds this reasoning persuasive.  That said, in an abundance of caution, the Court will assess the Executive Order and Plaintiff's claims thereto under both *Jacobson* and the traditional tiers of scrutiny.

### b.    The Executive Order Passes Muster Under *Jacobson*

Other courts in this Circuit have previously determined that the Executive Order and its successors are likely to pass muster under *Jacobson*, and this Court sees no basis to depart from their reasoning.  *See Page*, 478 F. Supp. 3d at 367 (finding that "plaintiff has not demonstrated that the Executive Order bears 'no real or substantial relation' to public health"); *Weisshaus* v. *Cuomo*, No. 20 Civ. 5826 (BMC), 2021 WL 103481, at *11 (E.D.N.Y. Jan. 11, 2021) (reaching the same conclusion with respect to Executive Order 205.1).  (*See also Corbett* Tr. 26:19-21 ("[G]iven the State's showing, it is not warranted to second-guess their informed and well-considered public health policies.")).

As noted above, under *Jacobson*, Plaintiff must demonstrate that the Executive Order's fourteen-day quarantine requirement bore "no real or substantial relation" to the public health or was "a plain, palpable invasion of rights secured by the fundamental law[.]"  197 U.S. at 31.  Plaintiff has not met this burden.  *First*, courts — as well as much of the public — are in agreement that COVID-19 is a highly infectious and potentially deadly disease.  *See, e.g.*, *Page*, 478 F. Supp. 3d at 367 (making the same observation); *see also Columbus Ale House* v. *Cuomo*, 495 F. Supp. 3d 88, 89 (E.D.N.Y. 2020) ("The novel coronavirus, SARS-CoV-2, and its associated disease, COVID-19, need no introduction.").  (*See generally* WHO Scientific

Brief (discussing modes of transmission of SARS-CoV-2, the virus that causes COVID-19)).  And the dangers of COVID-19 are further exacerbated by the fact that individuals who are asymptomatic can transmit the virus to others.  (WHO Scientific Brief 6).  *Second*, at the time the Executive Order was issued, New York was "one of only a few states reported to be on track to contain COVID-19," whereas other states were experiencing "an increased prevalence of COVID-19."  (*See* Executive Order).  The quarantine restrictions were thus enacted with the goal of curbing the transmission of COVID-19 from residents of states who possessed "a mathematically heightened risk of spreading COVID-19."  *Page*, 478 F. Supp. 3d at 370.  *Third*, the quarantine period of fourteen days was reasonable in light of guidance from the WHO.  In particular, the WHO determined that the "incubation period" of COVID-19 — that is, the time between exposure to the virus and symptom onset — was "on average 5-6 days, but [could] be as long as 14 days."  (*See* WHO Scientific Brief 9).  Accordingly, the Executive Order imposed a quarantine period of fourteen days — the upper limit of the incubation period.  *See Page*, 478 F. Supp. 3d at 367 (discussing the Executive Order's rationale for the fourteen-day quarantine period).

Plaintiff has made no showing that the quarantine period bore "no real or substantial relation" to the public health.  Instead, he questions the use of statewide data to determine a state's "risk profile" (Pl. Opp. 12), and alleges that other protective measures, such as mask mandates, surveys or a social distancing "pledge," would achieve the State's public health goals (FAC ¶ 47).  Courts have recognized that, in this pandemic, "there is room for significant disagreement about the wisdom and efficacy of the Governor's

17

protective measures[,]" particularly given the medical and scientific uncertainty inherent to any COVID-19 public health measure. *Columbus Ale House, Inc.*, 495 F. Supp. 3d at 93. Nonetheless, "it is not the role of the courts to second-guess the Governor's approach." *Id.*; *see also Our Wicked Lady LLC,* 2021 WL 915033, at *4 ("The setting of the appropriate limits for the City is not up to the plaintiffs or a court — it is up to the duly elected representatives of citizens.").

Further, for reasons that the Court will expand upon when it turns its focus to the claims at issue, Plaintiff has not demonstrated that the quarantine requirement is "beyond all question, a plain, palpable invasion of rights secured by fundamental law." *Jacobson*, 197 U.S. at 31; *see Page*, 478 F. Supp. 3d at 367 (determining that the self-quarantine requirement was not a "plain, palpable invasion" of plaintiff's fundamental right to travel).

In sum, Plaintiff's claims must be rejected under *Jacobson.* However, for completeness, the Court will address various failings in Plaintiff's claims under the traditional constitutional tiers of scrutiny analysis.

### c. Plaintiff's Right to Travel Claim Fails

To begin, Plaintiff asserts that the Executive Order violates his fundamental right to "travel among the states." (FAC ¶¶ 63-68). Under the traditional tiers of scrutiny analysis, a law that infringes upon a constitutionally-protected right is reviewed under the strict scrutiny standard. *See Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 100 (2d Cir. 2009); *see also Weisshaus*, 2021 WL 103481, at *7 (assessing Executive Order 205.1 under strict scrutiny). To meet this standard, the Government

18

must show that the regulation is "'narrowly tailored to promote a compelling Governmental interest,'" and "must use the least restrictive means to achieve its ends." *Evergreen Ass'n, Inc.* v. *City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (quoting *United States* v. *Playboy Entm't Grp.*, 529 U.S. 803, 804 (2000)).  In contrast, "when the right asserted is not fundamental, courts consider whether the government action at issue is 'rationally related to a legitimate state interest.'" *Our Wicked Lady LLC*, 2021 WL 915033, at *4 (quoting *Grand River Enter. Six Nations, Ltd.* v. *Boughton*, 988 F.3d 114, 121-22 (2d Cir. 2021)).

While the "right to travel" is not explicitly mentioned in the text of the Constitution, it is "firmly embedded" in the Supreme Court's jurisprudence. *See Saenz* v. *Roe*, 526 U.S. 489, 498 (1999).  The constitutional right to travel "embraces at least three different components":

> [i] the right of a citizen of one State to enter and to leave another State, [iii] the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, [iii] for those travelers who elect to be permanent residents, the right to be treated like other citizens of that State.

*Id.* at 500.  A law only implicates this right "'when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right.'" *Town of Southold* v. *Town of E. Hampton*, 477 F.3d 38, 53 (2d Cir. 2007) (quoting *Att'y Gen. of N.Y.* v. *Soto-Lopez*, 476 U.S. 898, 903 (1986)).

Defendants argue that Plaintiff has not plausibly alleged that the Executive Order implicates any component of the right to travel.  (Def.

Br. 9).[4]  Courts outside this Circuit have reached different conclusions as to whether quarantine requirements imposed in response to the COVID-19 pandemic burden the right to travel.  *Compare Bayley's Campground, Inc.* v. *Mills*, 463 F. Supp. 3d 22, 31-35 (D. Me. 2020) (determining that Maine executive order burdened plaintiff's right to travel), *aff'd*, 985 F.3d 153 (1st Cir. 2021), *with Carmichael* v. *Ige*, 470 F. Supp. 3d 1133, 1145-46 (D. Haw. 2020) (finding that Hawaii executive order did not violate plaintiffs' right to travel).  In this Circuit, courts have similarly divergent views on the implications of the Executive Order's quarantine requirement.  In *Corbett*, Judge Schofield indicated that the right to travel *was* implicated by the order, as it "deters some individuals from entering the state," which in turn "affects some of the components of the right to travel as set forth in *Saenz*." (*Corbett* Tr. 25:20-24).  The following month, in *Page*, a court in the Northern District of New York reached a different conclusion.  *See* 478 F.

---

[4]     Plaintiff responds with arguments and allegations about the potential logistical and financial burdens on non-residents who travel to New York and are forced to quarantine — specifically, the difficulties of locating a hotel that would accommodate non-residents' quarantine, as well as the attendant expenses.  (Pl. Opp. 12).  However, the Amended Complaint does not include these allegations regarding the logistical and financial burdens of quarantining, and the Court thus need not consider this newly-asserted argument in determining whether Plaintiff has alleged a violation of the right to travel.  *See Enzo Biochem, Inc.* v. *Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers."); *O'Brien* v. *Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the complaint cannot be amended by the brief in opposition to a motion to dismiss[.]").  Moreover, permitting Plaintiff leave to amend his Complaint a second time to include these allegations would be futile.  *See Grullon* v. *City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) ("Leave to amend may properly be denied if the amendment would be 'futile.'" (quoting *Foman* v. *Davis*, 371 U.S. 178, 182 (1962))).  Plaintiff refers the Court to no case law — and the Court is itself aware of none — indicating that the scenarios hypothesized in his briefing would amount to an interference with the right to travel.  *See Town of Southold* v. *Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) ("[T]ravelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on travel simply do not amount to the denial of a fundamental right." (internal quotation marks and citation omitted)).

Supp. 3d at 370.  While the district court acknowledged the decision in

*Corbett*, it emphasized that "not everything that deters travel burdens the

fundamental right to travel," *id.* (citing *Matsuo* v. *United States*, 586 F.3d

1180, 1183 (9th Cir. 2009)), and found that it was "far from clear" that the

Executive Order burdened any component of that right, *id.*  In particular,

the court took note of the following:

> Under the plain terms of the Order, individuals from
> restricted states remain free to enter New York.  They
> must comply with the quarantine requirement after
> they arrive, but that requirement is equally applicable
> to a New York resident who has arrived from a
> restricted state.  And whether resident or non-resident,
> any traveler who completes the quarantine remains
> completely free to travel freely within the State itself.
> In other words, the State is not drawing a distinction
> between residents and non-residents but between
> individuals with and without a mathematically
> heightened risk of spreading COVID-19.

*Id.*  For these reasons, the court distinguished the Executive Order from a

Maine executive order that was found to burden the right to travel because

it "effectively closed the borders of Maine 'to any out-of-stater who does not

own or rent property' by directing hotels, motels, and even campgrounds to

turn away all travelers who had not already completed their quarantine

within the state."  *Id.* (discussing *Mills*, 463 F. Supp. 3d at 34-35).

The Court appreciates the thoughtful analyses of the courts that have

previously confronted challenges to the Executive Order and similar

quarantine requirements.  However, even assuming the Executive Order did

burden the right to travel, the Court finds that it nonetheless withstands

both strict scrutiny and rational basis review.  (*See Corbett* Tr. 25:18-26:15

(finding that the Executive Order implicated the right to travel but survived strict scrutiny review)).

Beginning with the more strenuous standard, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 67. (*See also* FAC ¶¶ 28, 54 (conceding the Government's "compelling state interest" in protecting the public health)). And the Court finds that the Executive Order was narrowly tailored to achieve its public health goals. As explained above, the COVID-19 virus is highly contagious (*see generally* WHO Scientific Brief); individuals who are infected with COVID-19 but present as asymptomatic may unwittingly subject others to the risk of infection (*id.* at 6); and the disease has an incubation period of up to fourteen days (*id.* at 9). For these reasons, at the time the Executive Order was enacted, there was no indication that less restrictive means would have achieved New York State's stated interests. Moreover, the Executive Order did not restrict individuals traveling from all states. Rather, its quarantine requirement applied only to individuals traveling from states where there was significant community transmission and thus a greater likelihood that travelers would be carrying the virus.

Plaintiff alleges that less restrictive means could have accomplished these same public health goals, including requiring all individuals entering New York State to (i) wear a face mask; (ii) complete a contact tracing survey; or (iii) pledge "that he or she will socially distance and only go out for essential business." (FAC ¶ 47). It is difficult to assess these proposed measures in hindsight, given the evolving medical and scientific understanding of the virus. However, the Court accepts that at the time the

22

Executive Order was enacted, in light of rising positivity rates in certain states, concerns about the spread of the disease from asymptomatic individuals, and the difficulties of enforcing less restrictive requirements, such measures would not have been sufficient to achieve Defendants' stated interests.  *Cf. Our Wicked Lady LLC*, 2021 WL 915033, at *5 ("A government may pursue multiple paths to curb transmission of the virus.").

Turning to rational basis review, the Court finds that it was rational for Defendants to require individuals from states with high positivity rates to quarantine for the duration of the COVID-19 virus's incubation period. Under rational basis review, courts consider "whether, at enactment, there is a rational link between the harm a statute is intended to remedy and the method by which a legislature chooses to address it."  *Boughton*, 988 F.3d at 123.  Plaintiff cannot plausibly allege that there was no rational link between requiring individuals from states with high rates of COVID-19 positivity tests to quarantine for the duration of the virus's incubation period, and reducing further spread of the disease in New York State.

The Court thus finds that the Executive Order was a calibrated response to the COVID-19 public health crisis, and that at the time of its issuance, there were no less restrictive alternatives that would have achieved its significant goal — that of minimizing further mortality and morbidity in New York State.  With this in mind, the Court will consider Plaintiff's claims brought pursuant to the Privilege and Immunities Clause and the Equal Protection Clause.

23

### d. Plaintiff's Equal Protection Claim Fails

Plaintiff next asserts that the Executive Order violates the Equal Protection Clause of the Fourteenth Amendment. (FAC ¶¶ 69-70). The Equal Protection Clause states that "no state shall deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. Amend. XIV, "which is essentially a direction that all persons similarly situated should be treated alike[,]" *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). An individual may assert either a "class of one" or a "selective enforcement" equal protection claim. *See generally Artec Constr. & Dev. Corp.* v. *N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 15 Civ. 9494 (KPF), 2017 WL 782911, at *2 (S.D.N.Y. Feb. 27, 2017). Plaintiff has not clarified which theory he is pursuing, and the Court thus will discuss the requirements of both non-class-based equal protection claims.

Under either theory, an individual must demonstrate that he was treated differently from other similarly-situated individuals. *See Bizzarro* v. *Miranda*, 394 F.3d 82, 86 (2d Cir. 2005). To prevail on an equal protection claim based on selective enforcement of the law, a plaintiff must prove that: "'[i] the person, compared with others similarly situated, was selectively treated, and [ii] the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Hu* v. *City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (quoting *Zahra* v. *Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). And to prevail on a "class of one" claim, a plaintiff must establish that "[i] no rational person could regard the circumstances of

24

the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [ii] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* at 92 (quoting *Neilson* v. *D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel* v. *Spiridon*, 531 F.3d 138 (2d Cir. 2008)).  While "class of one" claims require "an 'extremely high' degree of similarity between a plaintiff and comparator," selective enforcement claims "merely require[] a 'reasonably close resemblance' between a plaintiff's and comparator's circumstances." *Id.* at 93.

Defendants argue that Plaintiff cannot state a claim under either theory of equal protection, inasmuch as he has failed to allege the existence of similarly situated comparators. (Def. Br. 10).  In particular, they submit that travelers entering New York from states that are not subject to the quarantine requirement are *not* similarly situated because they are arriving from states with "objectively lower rates of infection." (*See id.*).  Plaintiff retorts that Defendants' arguments as to whether individuals are or are not similarly situated merely refer to the very categorizations created by the Executive Order, and that this is "circular logic." (Pl. Opp. 12-13).  He further questions the methodology used to determine the states subject to the quarantine requirement.  (*Id.*).

The Court agrees with Defendants that, at the time the Executive Order was enacted, Plaintiff was not similarly situated to travelers from non-restricted states.  Plaintiff fails to allege that there was either an "extremely high degree of similarity" or a "reasonably close resemblance" between

25

himself and travelers to New York from non-restricted states.  *Hu*, 927 F.3d at 93.[5]  To the contrary, Defendants have demonstrated that these travelers were *not* similarly situated, as they were arriving from states with objectively lower rates of infection.  *See Lilakos* v. *New York City*, 808 F. App'x 4, 8 (2d Cir. 2020) (summary order) (dismissing Equal Protection Clause claim for failure to allege facts showing the comparators are "similar in relevant respects").  Plaintiff has thus not alleged the requisite level of similarity to establish a "class of one" equal protection claim.  Plaintiff also fails to meet the less stringent standard for a selective enforcement claim.  While Plaintiff is plainly skeptical of the methodology employed to identify states subject to the quarantine requirement, he nonetheless has not alleged an "intent to discriminate" against travelers from those states.  *Hu*, 927 F.3d at 92.  (*See* FAC ¶ 54 ("This lawsuit … freely grants Governor Cuomo's good intentions.")).

Because Plaintiff has failed to plead facts suggesting that he has been treated differently from others similarly situated, the Court dismisses his equal protection claim.

### e.    Plaintiff's Privileges and Immunities Claim Fails

Lastly, Plaintiff asserts a claim under the Privileges and Immunities Clause of Article IV.  (FAC ¶¶ 71-72).  The Privileges and Immunities Clause states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. art. IV, § 2, cl. 1.

---

[5]    While Plaintiff himself resided in a non-restricted state at the time he filed his Amended Complaint (FAC ¶¶ 2, 4), given his concerns that he would be required to quarantine were he to traverse a restricted state prior to traveling to New York (*id.* at ¶ 58), the Court thus is not grouping him with travelers from non-restricted states for the purpose of analyzing his equal protection claim.

It is understood to guarantee "'that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy.'" *Schoenefeld* v. *Schneiderman*, 821 F.3d 273, 279 (2d Cir. 2016) (quoting *Baldwin* v. *Fish & Game Comm'n of Mont.,* 436 U.S. 371, 382 (1978)).  By its "plain language" the Clause "mandates a reciprocal arrangement among the several states comprising the United States whereby residents of one state are entitled to enjoy the same rights as citizens of other states." *Selevan*, 584 F.3d at 102.

Defendants argue that the Executive Order does not discriminate against citizens of other states in favor of New York State residents, and that Plaintiff has thus failed to state a claim under the Privileges and Immunities Clause.  (Def. Br. 11).  In particular, they note that under the Executive Order, a New York resident entering New York from a restricted state would be subject to the very same quarantine requirements as residents of that restricted state.  (*Id.*).  The district court in *Page* was persuaded by this reasoning, and accordingly dismissed a similar challenge to the Executive Order.  *See* 478 F. Supp. 3d at 370 (observing that the quarantine requirement was "equally applicable to a New York resident who has arrived from a restricted state").  This Court agrees.

Plaintiff concedes that the Order "does not — *on its face* — discriminate against … non-New York residents" (Pl. Opp. 13 (emphasis in original)), but argues that it nonetheless has the effect of discriminating against non-New York residents who are unable to quarantine in the comfort of their own homes, and may instead be subjected to the costs of a hotel

27

(*id.*).[6]  Significantly, however, a plaintiff asserting a Privileges and Immunities Clause challenge must demonstrate "that the state has burdened nonresident activity that is 'sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause.'"  *See Schoenefeld*, 821 F.3d at 279 (quoting *Supreme Court of Va.* v. *Friedman*, 487 U.S. 59, 64 (1988)).  If a plaintiff makes such a showing, the state may defend its position by demonstrating that "substantial reasons exist for the discrimination and the degree of discrimination bears a sufficiently close relation to such reasons."  *Id.* (quoting *Friedman*, 487 U.S. at 67).  In addition, a plaintiff must "allege or offer some proof of a protectionist purpose" to maintain a Privileges and Immunities Clause claim.  *Id.* at 281.  "A statute enacted for … a nonprotectionist purpose is not vulnerable to a Privileges and Immunities challenge."  *Id.* at 282.

Although Plaintiff asserts a Privileges and Immunities Clause claim separate from his right to travel claim, there is little discernible daylight between the two.  Indeed, the right to travel has been "variously assigned to the Privileges and Immunities Clause of Article IV," among other constitutional provisions.  *Soto-Lopez*, 476 U.S. at 902; *see also Saenz*, 526 U.S. at 500-01 (holding that the right "to be treated as a welcome visitor rather than an unfriendly alien" is "expressly protected" under the Privileges and Immunities Clause of Article IV); *Selevan*, 584 F.3d at 102 (analyzing right-to-travel claims under the Privileges and Immunities Clause of the

---

[6]     As noted above, Plaintiff's Amended Complaint is devoid of any allegations regarding the financial burden of quarantine on non-resident travelers.  More to the point, in light of the Court's resolution of Plaintiff's claims in the remainder of this Opinion, the addition of such allegations would not render these claims viable.

Fourteenth Amendment and the Privileges and Immunities Clause of Article

IV). And Plaintiff does not himself identify any distinctions between these

claims. (*See* FAC ¶¶ 63-68, 71-72).

Thus, for much of the same reasons discussed above, the Court finds

that even were the right to travel implicated by the Executive Order,

Defendants have provided a "substantial reason" for the difference in

treatment and demonstrated that the Executive Order bears a "sufficiently

close relation" to its objective.

What is more, Plaintiff's Privileges and Immunities Clause claim can

be dismissed for a separate reason. Plaintiff has not alleged that the

Executive Order's quarantine requirement was enacted with the

protectionist purpose of burdening non-residents who wish to travel to New

York. Rather, Plaintiff himself concedes that the Executive Order was

enacted with the purpose of protecting New York from further spread of the

coronavirus. (*See* FAC ¶¶ 28, 54). As the court in *Page* observed, the

Executive Order does not "draw[] a distinction between residents and non-

residents[,] but between individuals with and without a mathematically

heightened risk of spreading COVID-19." 478 F. Supp. 3d at 370. While the

Court is sympathetic to Plaintiff's arguments about the potential costs

associated with quarantining, the Privileges and Immunities Clause "'does

not promise nonresidents that it will be as easy for [them] as for residents to

comply with a state's law.'" *Schoenefeld*, 821 F.3d at 284-85 (holding that a

statute requiring a non-resident attorney licensed in New York to incur the

costs of maintaining a New York office did not manifest any "protectionist

intent"). Rather, "[i]t promises only that state laws will not differentiate for

29

the protectionist purpose of favoring residents at the expense of nonresidents." *Id.* at 285.

In light of the Executive Order's undisputed nonprotectionist purpose, and given that Plaintiff has not put forth any allegations of a "protectionist intent," the Court finds that Plaintiff has failed to establish a violation of the Privileges and Immunities Clause. *See Schoenefeld*, 821 F.3d at 282-83. Accordingly, this claim is dismissed.

### 3.   The Court Denies Plaintiff Leave to Replead

 "Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court 'should freely give leave [to amend] when justice so requires.'" *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (quoting Fed. R. Civ. P. 15(a)(2)).  Consistent with this liberal amendment policy, "'[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'" *Id.* (alteration in *Gorman*) (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  That being said, "it remains 'proper to deny leave to replead where ... amendment would be futile.'" *Id.* (quoting *Hunt* v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)).

Plaintiff has sought leave to amend (*see* Pl. Opp. 4, 14), but the Court concludes that any amendment would be futile.  Plaintiff has previously amended his complaint, but his Amended Complaint fails to state a claim on which relief can be granted.  Moreover, Plaintiff was put on notice of the deficiencies in his Amended Complaint by Defendants' September 14, 2020 letter previewing their anticipated motion to dismiss (*see* Dkt. #13), but

instead opted to oppose the motion rather than to seek leave to amend (*see* Dkt. #14).  *Cf. Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (alteration, footnote, and internal quotation marks omitted)); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).  And as noted previously, given the legal analyses detailed in this Opinion, the Court does not believe that Plaintiff can plead facts that would render his claims viable.  For all of these reasons, the Court will dismiss the Amended Complaint with prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED, and Plaintiff's Amended Complaint is DISMISSED WITH PREJUDICE. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      June 3, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

32